# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,

v.

DEWAYNE JOYNER,
    *Defendant*.

No. 3:17-cr-00236 (JAM)

## ORDER DENYING MOTION TO SUPPRESS

Defendant Dewayne Joyner moves to suppress evidence that was seized from him by law enforcement agents in the course of executing search warrants for his person and for a hotel room where he was staying. Because the search warrants were supported by probable cause and because Joyner has not shown any other legal defect in the execution of the warrants that would justify a remedy of suppressing evidence, I will deny Joyner's motion.

### BACKGROUND

A federal grand jury indictment charges Joyner with knowingly possessing heroin with intent to distribute it on various dates from September 6 to September 12, 2017. The charges stem from an investigation based in Bridgeport, Connecticut that included several controlled purchases of heroin from Joyner. These purchases were followed by his arrest late on the night of September 11, 2017, after he was found by law enforcement officers with heroin on a street outside a Bridgeport hotel. The officers subsequently searched his hotel room in the early morning hours of September 12, 2017, and found more heroin as well as packaging materials.

Joyner has moved to suppress the evidence found on him at the time of his arrest as well as the evidence found in his hotel room. All this evidence was obtained in conjunction with the execution of search warrants for Joyner's person and for the hotel room. Because the adequacy

1

of these two search warrants is the focus of Joyner's motion to suppress, I will describe them in some detail.

The affidavit in support of the first search warrant for Joyner's person was co-signed by Detective Dennis Martinez and Officer Chris Martin of the Bridgeport Police Department. Doc. #36-1 at 14 (¶¶ 1-2). The affidavit recounted information received from a "Confidential Informant," who was described as a "known credible and reliable informant" and who told the affiants that there was someone by the nickname of "Weezy" who "was selling heroin" in Bridgeport, that the Confidential Informant himself had bought heroin "in the past" from "Weezy," and that "Weezy" used a certain telephone number. *Id.* (¶¶ 3-5).

The Confidential Informant identified a photograph of Joyner as "Weezy." *Id.* at 15 (¶ 7). The Confidential Informant also agreed to make a controlled purchase of heroin from Joyner, and the affidavit describes how he went through with a controlled purchase of heroin from Joyner during the week of September 6, 2017, all of which was monitored by law enforcement agents. *Id.* at 15-16 (¶¶ 8-12). This controlled purchase occurred outside a house at 164 Cleveland Avenue in Bridgeport, and Joyner was seen by law enforcement agents emerging from the house to meet the Confidential Informant and then returning back to the house afterwards. *Id.* at 15 (¶ 10). On the basis of all these facts, the search warrant affidavit alleged there was "probable cause to believe that evidence of Possession of Narcotics with Intent to Sell, 21a-278(b), is located on the body of" Joyner. *Id.* at 17 (¶ 16).

A Connecticut state court judge signed this search warrant for Joyner's person at 10:51 p.m. on the night of September 11, 2017. *Id.* at 12; Doc. #45 at 27-28. In the meantime, law enforcement officers had Joyner under continuing surveillance. At around midnight, they saw Joyner leave 164 Cleveland Avenue and drive to the Holiday Inn in Bridgeport. Doc. #45 at 33-

2

34; Doc. #76 at 61. After he parked his car on the street next to the hotel, the officers closed in to execute the search warrant. They searched Joyner and the area immediately around him and found about $1,300 in cash, 10 glassine folds of heroin, a bag with a leafy substance, a half-pill of Viagra, four cellphones, and a Holiday Inn hotel key card. Doc. #36-1 at 20; Doc. #45 at 36-37, 39, 49.[1]

The officers placed Joyner under arrest and then went inside the Holiday Inn with the key card to ask to see if Joyner had a room there. Doc. #45 at 40-41, 83, 132; Doc. #76 at 37, 88; Doc. #83 at 37. The desk clerk ran the card, and then printed out a receipt with Joyner's name and room number, and the officers told the clerk that they were going to obtain a search warrant for this room. Doc. #45 at 41; Doc. #76 at 89, 93; Doc. #83 at 38.

The officers also decided to do a protective sweep of the room. One of the supervising agents—ATF Special Agent Michael Oppenheim—testified at the suppression hearing about his reason for doing a protective search, because of his concern that Joyner had recently been involved in an armed robbery of narcotics, and the agent was concerned about the possibility that Joyner might have armed confederates in the hotel room. Doc. #45 at 123-25. The protective sweep lasted approximately one minute and did not reveal that there was anyone else in the room or involve the search for or seizure of any evidence. *Id.* at 127-31.

---

[1] Joyner initially contended in these suppression proceedings that the officers lied when they alleged that they found a hotel key card at the time that they searched him. Joyner signed an affidavit that was filed along with his motion to suppress attesting that at the time that the officers detained and searched him "I was not in possession of a key card for any room at the Holiday Inn" and that "[t]he police seized several items after they searched me, including cash and cell phones," but that "[t]hey did not seize a key card or swipe card for the Holiday Inn, because I did not have one on my person at the time." Doc. #19-2 at 1; *see also* Doc. #19-1 at 3 (Joyner's memorandum in support of motion to suppress arguing that "[h]e did not have a room key/swipe card on him when searched by police on the evening of September 11, 2017" and that the police falsified the evidence against him). Notwithstanding these initial allegations of false evidence, Joyner ended up testifying to the contrary at the suppression hearing. He testified that he had a hotel key card with him when he parked the car outside the hotel, but that it fell out of his pocket and was "probably" on the ground next to the car at the time that the officers searched him and that he in fact saw the key card on "the floor" as the officers first approached him. Doc. #83 at 71-73, 83-85; 97-98. In light of Joyner's testimony, there is no longer any dispute that the officers seized the key card from Joyner's person or from the immediate area around him at the time that they detained and searched him.

3

Neither of the search warrant affiants—Detective Martinez and Officer Martin—took part in the protective sweep. Doc. #45 at 43-44; Doc. #83 at 39. Agent Oppenheim testified that nothing was communicated to the affiants about what was seen during the protective sweep, Doc. #45 at 129, and Officer Martin credibly testified that he planned to apply for the search warrant regardless of the protective sweep, Doc. #45 at 109.

Detective Martinez and Officer Martin then drafted another search warrant affidavit that recounted essentially the same facts from the first affidavit as discussed above for the search warrant of Joyner's body but also added more facts specific to their reasons for believing that there would be narcotics evidence in Joyner's hotel room. This second affidavit recounted the search of Joyner on the street outside the Holiday Inn and the recovery from him of suspected heroin in glassine bags packaged for street level sales, four cell phones, a quantity of money "consistent with the sale of narcotics," and "a swipe card key belonging to the Holiday Inn." Doc. #36-1 at 27 (¶ 16).

The second affidavit further alleged that "during the course of this investigation source information had indicated that Dwayne [*sic*] Joyner had been staying at the Holiday Inn and using the hotel to store narcotics." *Ibid.* (¶ 17). In addition, it described how during the investigation Joyner was seen "[o]ver the course of several days" both "coming and going" from 164 Cleveland Avenue and also that "[s]urveillance conducted at the Hoiliday [*sic*] Inn observed Dwyane Joyner entering and exiting the hotel." *Ibid.* The affiants alleged on the basis of their training and experience that "[i]ndividuals that are involved in the sale of narcotics frequently change their routine and patterns in order to avoid detection by police and further routinely utilize addresses and areas not associated with them in effort to keep and maintain their narcotics trade." *Ibid.*

4

The second affidavit additionally noted that "[t]hat upon locating the key on the person of Dwyane Joyner, officers contacted the Holiday Inn," and "[a] check would reveal that Dwyane Joyner date of birth [redacted] had rented room #723 on 09/10/2017 and was to check out on 09/12/2017." *Ibid.* (¶ 18). On the basis of these facts, the affiants alleged there was probable cause to believe that evidence of Possession of Narcotics with Intent to Sell, 21a-278(b), was located in Room #723 of the Holiday Inn. *Ibid.* (¶ 19).

A Connecticut state court judge approved the warrant in the early morning hours of September 12, 2017. Doc. #36-1 at 27; Doc. #45 at 45. At around 2:00 a.m. or 3:00 a.m., officers searched the hotel room pursuant to the warrant and found more than 100 grams of heroin along with narcotics packaging paraphernalia such as a scale, baggies, a face mask, and a cutting agent. Doc. #45 at 82; Doc. #83 at 77 (Joyner's testimony admitting that items found in hotel room were his).

Joyner has moved to suppress some of the evidence against him. I held three evidentiary hearings at which the following witnesses testified: Officer Christopher Martin, Detective Dennis Martinez, ATF Special Agent Michael Oppenheim, Jordan Williams (hotel desk clerk), Roosevelt Billups (Joyner's brother), and Joyner himself. Because Joyner's stated grounds for suppression shifted over time, I required Joyner to file briefing that specified all of the grounds that the Court should consider for suppression. Doc. #83 at 93-99. Joyner's briefing now identifies three grounds for suppression. Doc. #89 at 1. In this ruling I will address only those three grounds, and I deem any other argument for suppression to have been abandoned, forfeit, and waived.

## DISCUSSION

The Fourth Amendment protects the rights of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and it further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

When a criminal defendant moves to suppress evidence on Fourth Amendment grounds, courts ordinarily consider one or more of several questions in sequence. As a threshold matter, was there a "search" or "seizure" that triggers the protections of the Fourth Amendment? If so, did the government have a court-authorized warrant to justify the search or seizure and did the government act in accord with the warrant? If there was no warrant (or if the search or seizure exceeded the scope of the warrant), was the government's search or seizure otherwise justifiable under any of the well-recognized exceptions to the Fourth Amendment's warrant requirement? Lastly, even if the search or seizure was unlawful, is an order that excludes the evidence from trial an appropriate remedy for the government's misconduct? *See United States v. Robertson*, 239 F. Supp. 3d 426, 441 (D. Conn. 2017). The facts of this case touch on many of these questions.

### *Seizure of hotel key card*

Joyner's first argument for suppression is that the officers exceeded the scope of their search warrant for his person when they seized the hotel key card, because the search warrant did not authorize them to seize any hotel key cards. I agree that the warrant did not specify the seizure of any hotel key cards, but I conclude that the officers were otherwise entitled to seize the hotel swipe key under the "plain view" exception to the Fourth Amendment's warrant

requirement. "Under the plain-view exception, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'" *United States v. Delva*, 858 F.3d 135, 149 (2d Cir. 2017) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)).

All these requirements are met here. First, the officers were in a lawful position. They had a lawful right to be on the public street outside the hotel where they searched Joyner and recovered the card.

Second, the officers had a lawful right of access to the key card. If the officers recovered the card from Joyner's person (as the search warrant return reflects), then they had a lawful right of access to the card because of the search warrant. If instead the officers seized it from the ground just outside the car (as Joyner suggests), then they also had a lawful right of access to the card as it lay on a public street.

Third, the criminality of the key card was immediately apparent, because the officers had probable cause to believe that the key card was connected with his criminal activity (*i.e.*, Joyner's storage of narcotics in his hotel room). As noted in the warrant affidavit and credibly demonstrated by testimony at the suppression hearing, the officers had received source information that Joyner was storing narcotics in a room at the hotel, and this information was corroborated in part by the officers' observation of Joyner entering and exiting the hotel as well as their encounter of him immediately outside the hotel for the purpose of executing their search warrant for his person. The plain view exception allows not only seizure of contraband that is observed in plain view but also other non-contraband items if officers have "probable cause to suspect that the item is connected with criminal activity." *See United States v. Kirk Tang Yuk*,

7

885 F.3d 57, 79 (2d Cir. 2018) (plain view exception allowed seizure of two cell phones where "the officers had probable cause to seize the cell phones as likely connected with [defendant's] criminal activity").

In any event, even if the plain view exception did not apply here, Joyner would be entitled at most to suppression of the key card only rather than the suppression as he seeks of all the incriminating evidence later found in the hotel room. That is because immediately after the search and arrest of Joyner, the officers went into the hotel to inquire of the desk clerk if Joyner had a room there, and the desk clerk lawfully confirmed this to be so. *See City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2454 (2015) ("hotel operators remain free to consent to searches of their registries"). Therefore, regardless whether the officers had physically seized and used the hotel card as they did, their entry into the hotel to inquire about Joyner and their eventual search of the hotel room was inevitable and based on evidence independent from their seizure and use of the card. *See Murray v. United States*, 487 U.S. 533, 538 (1988) (noting that the "independent source" doctrine applies to bar exclusion of evidence where "evidence [is] acquired in fashion untainted by the illegal evidence-gathering activity"); *Vanegas-Ramirez v. Holder*, 768 F.3d 226, 236 n.21 (2d Cir. 2014) (same).

Accordingly, regardless of the fact that the search warrant did not authorize the seizure of a hotel key card, I conclude that the officers lawfully seized the hotel key card under the plain view exception to the warrant requirement. Moreover, even if the plain view exception did not apply, I conclude that there would be no grounds based on the seizure of the card for suppression of the fruits of the search of the hotel room.

*Facial sufficiency of search warrant affidavit for hotel room*

Joyner's second argument for suppression is that the search warrant affidavit for the hotel room was insufficient on its face to establish valid probable cause. According to Joyner, the existence of probable cause to search the hotel room was impermissibly premised on uncorroborated "source information" that Joyner was "staying at the Holiday Inn and using the hotel to store narcotics." Doc. #36-1 at 27. Joyner contrasts the lack of any description about the credibility or reliability of this unnamed "source" with the affidavit's description of the known reliability of the Confidential Informant who informed the officers about Joyner's heroin dealing and took part in a controlled purchase transaction. Doc. #36-1 at 24. According to Joyner, "the SOI's [source information's] essentially anonymous tip cannot support a finding of probable cause because the substance was not sufficiently corroborated." Doc. #89 at 23.

I do not agree. "Probable cause is a fluid concept turning on the assessment of probabilities in particular factual contexts." *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015) (internal quotation marks omitted). Probable cause therefore cannot be "reduced to a neat set of legal rules." *Ibid.* As a result, when a court is asked to review a probable cause determination that has been made by another judge in the course of reviewing and approving a warrant, the court "generally accords substantial deference to the finding of an issuing judicial officer that probable cause exists," limiting its inquiry to whether the officer "had a substantial basis" to decide in light of the totality of the circumstances that there was "a fair probability that contraband or evidence of a crime w[ould] be found in a particular place." *Ibid.*

Joyner's argument proceeds on an assumption that it is legally invalid for a warrant affidavit to describe facts learned from an unnamed source unless the affidavit further describes more about the source's identity, the source's basis for knowledge, or the source's prior track

record for furnishing reliable information.[2] To be sure, such additional credibility-enhancing information about the source is doubtlessly important and relevant to how much weight should be given to the source's information. But the Fourth Amendment does not impose a categorical prerequisite that such supplemental information be included in order for an affidavit to rely at all on information learned from an unnamed source. The existence of probable cause is evaluated by means of considering the totality of the circumstances and without formalistic rules of pre-qualification for the consideration of third-party source information. *See Illinois v. Gates*, 462 U.S. 213, 241-46 (1983); *United States v. Elmore*, 482 F.3d 172, 179-81 (2d Cir. 2007) (discussing "sliding scale" approach to the evaluation of informant credibility).

Accordingly, it was proper for the state court judge here to consider the affidavit's recital of information learned from an unnamed source whose basis for knowledge or overall reliability was not otherwise described. Moreover, the affidavit recited ample additional facts that circumstantially corroborated the information furnished by the unnamed source. This included information from a known and reliable confidential informant that Joyner was selling heroin in Bridgeport, and corroboration of this information by means of a recent controlled purchase of heroin from Joyner. It also included information about the search of Joyner just outside the hotel and the recovery from him of heroin packaged for distribution as well as a large amount of cash consistent with drug dealing. In addition, the affidavit described the recovery of a hotel key card

---

[2] Of course, it would be improper if an affidavit referred to "source" information when in fact there was no such "source" that furnished information. Joyner initially argued that there was no such source but later retracted that allegation in light of the Government's identification of the name of the source and disclosure of an investigation report. Doc. #76 at 5-6; Doc. #83 at 95-96; *see also* Doc. #45 at 30-32, 122-23, 126; Doc. #83 at 27-29 (law enforcement officer testimony verifying existence of person who was "source information" as referred to in affidavit). In light of this verification that there was an actual source for the information reported in the affidavit, I conclude that Joyner has not established *prima facie* grounds to challenge the validity of what the source told the officers, and therefore I decline to require the source to appear for *in camera* questioning as Joyner asks me to do. Doc. #89 at 23. *See United States v. Fixen*, 780 F.2d 1434, 1439 (9th Cir. 1986) ("a district court need not conduct an *in camera* hearing whenever the identity of an informant is requested" and "it is within the judge's discretion whether to hold such a hearing").

from Joyner and that Joyner had rented a room there. All this was easily sufficient to justify the state court judge's conclusion that there was probable cause to search Joyner's hotel room.

Even if the affidavit were lacking in its showing of probable cause, I would not suppress the evidence, because I conclude that the officers relied in good faith on the state court judge's independent determination that there was probable cause. *See United States v. Leon*, 468 U.S. 897, 922 (1984); *United States v. Boles*, 914 F.3d 95, 103 (2d Cir. 2019). It is true that there are certain exceptions to this good faith reliance rule, such as "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *Boles*, 914 F.3d at 103. But Joyner has shown neither that the officers misled the state court judge (as discussed more in the next section below), nor that the state court judge abandoned her role, nor that it was patently obvious from the face of the affidavit that it did not allege enough facts to establish probable cause.

### *Alleged misstatements and omissions*

Joyner's third and final argument for suppression is that the hotel room search warrant affidavit contains false statements and omissions that were necessary to the affidavit's establishment of probable cause. Under *Franks v. Delaware*, 438 U.S. 154 (1978), a criminal defendant who seeks to suppress the fruits of a search warrant must show that (1) the affiant knowingly and intentionally, or with a reckless disregard for the truth, made false statements or omissions in his application for a warrant, and (2) such statements or omissions were necessary to the finding of probable cause. *Id.* at 155-56; *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017). To determine whether the misrepresentations or omissions were necessary to the finding

of probable cause, courts apply the "corrected affidavit" approach, which requires a court to decide whether the affidavit would still establish probable cause if its allegedly false statements were corrected and its alleged omissions of facts were included. *Id.* at 82.

Joyner argues that the affidavit falsely stated that he resided at 164 Cleveland Avenue in Bridgeport, when in fact his mother lived there, and he lived on Fairfield Avenue in Bridgeport. Doc. #89 at 25-26; Doc. #83 at 65. I need not consider whether this information was false, because it is immaterial to whether the affidavit established probable cause to search the hotel room. The evidence at the suppression hearing established that Joyner lived somewhere in Bridgeport (regardless of particular address) and that he engaged in a controlled purchase transaction on the sidewalk just outside 164 Cleveland Avenue; he was seen leaving the home at 164 Cleveland Avenue immediately before the transaction and then entering it again afterwards. Doc. #45 at 18. Joyner's own brother testified that Joyner frequently visited 164 Cleveland Avenue, and both Joyner and his brother testified that Joyner had been there on the evening of September 11, 2017, shortly before his arrest later that night at the Holiday Inn. Doc. #76 at 101, 104; Doc. #83 at 76. Whether Joyner actually lived or slept at 164 Cleveland Avenue (as opposed to frequently being there) is irrelevant to whether the affidavit established probable cause to search the hotel room.

Joyner next argues that the warrant affidavit misrepresented that Joyner was observed during "surveillance" entering and exiting the hotel. Doc. #89 at 26-27. But Joyner does not dispute that one officer saw him enter the hotel and that another officer saw him exit the hotel during the hours shortly before he was searched. *Ibid.*; *see also* Doc. #45 at 69; Doc. #83 at 32, 61. Instead, he disputes that these transitory observations amounted to "real surveillance," because one of the officers testified that his surveillance was "very brief," and the other officer

testified that he saw Joyner while he was "merely driving past the Holiday Inn." *Ibid.* The upshot is that the affidavit truthfully recited material facts showing that Joyner had been observed by law enforcement entering and exiting the hotel, and Joyner's quibble about the use of the word "surveillance" is irrelevant to whether the affidavit established probable cause.

Joyner next argues that the affidavit was misleading because it recited the unnamed "source information" about Joyner's staying at the hotel and storing narcotics there but without making it clear that this source was a second confidential informant who was different from the first confidential informant referenced at the beginning of the affidavit. *Id.* at 27-28. I do not agree. The wording of the affidavit is not misleading in any respect and does not remotely suggest that the "source information" was the same person as the first confidential informant.

Joyner next argues that the affidavit should have included the fact that officers had performed a warrantless protective sweep of the hotel room. *Id.* at 29-33. I do not agree. The suppression hearing testimony established that no narcotics evidence was seen or seized during the protective sweep and that the officers had already decided before the protective sweep was done to seek a search warrant.

To the extent that I expressed concern at the suppression hearing about the possibility that the officers could have used a protective sweep as pretextual grounds for a "sneak-and-peek" foray to determine if they should apply for a search warrant, see Doc. #45 at 112, the later evidence introduced during the hearing convinced me that the officers engaged in the protective sweep in good faith and not for pretextual purposes. Doc. #45 at 117-40 (testimony of ATF Special Agent Oppenheim). I also conclude that the protective sweep and anything learned from the protective sweep did not cause or prompt officers to apply for the search warrant of the hotel room. Doc. #45 at 109, 125-26. *See Murray*, 487 U.S. at 542 (unlawful entry into warehouse did

13

not render invalid later search warrant for warehouse where the search warrant affidavit did not rely on any observations from the initial unlawful entry and was not causally prompted by any of the observations made during the initial unlawful entry); *United States v. Bullard*, 645 F.3d 237, 244 (4th Cir. 2011) (search warrant not invalid because of prior illegal search, and officers not required to include fact of prior illegal search in warrant affidavit; "[a]lthough [defendant] challenges the omission as deceptive, in fact this omission is critical to saving the warrant here from the taint of the earlier search"). Accordingly, I conclude that there were no material misstatements or omissions in the affidavit for the hotel room search warrant, and the officers' protective sweep did not otherwise invalidate grounds for the search warrant.

## CONCLUSION

For the reasons set forth above, defendant Dewayne Joyner's motion to suppress (Doc. #19) is DENIED.

It is so ordered.

Dated at New Haven this 22d day of April 2019.

/s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge